## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DAVID BLINN, Individually and on Behalf of All Others Similarly Situated, | Case No. _____ |
| Plaintiff, | |
| v. | CLASS ACTION |
| FXCM INC, DROR NIV, and ROBERT N. LANDE | JURY TRIAL DEMANDED |
| Defendants. | |

## COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Plaintiff David Blinn ("Plaintiff"), by his attorneys, except for his own acts, which are alleged on knowledge, alleges the following based upon the investigation of counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by FXCM Inc. ("FXCM" or the "Company"), as well as regulatory filings and reports, securities analyst reports and advisories by the Company, press releases and other public statements issued by the Company, and media reports about the Company. Plaintiff believes that additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery:

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of all investors who purchased or otherwise acquired FXCM securities between March 15, 2012 and February 6, 2017, inclusive (the

"Class Period"), seeking remedies under the Securities Exchange Act of 1934 (the "Exchange Act"). Plaintiff's claims are asserted against certain of FXCM's executive officers and directors.

2.     FXCM is an online provider of foreign exchange ("FX") trading and related services to over 175,000 active retail accounts globally. FXCM offers customers access to over-the-counter ("OTC") FX markets and has developed a proprietary technology platform that provides customers with an efficient and cost-effective way to trade FX. In an FX trade, a participant buys one currency and simultaneously sells another, a combination known as a "currency pair." FXCM's platform seeks to present FX customers with the best price quotations on 45 currency pairs from up to 31 global banks, financial institutions and market makers ("FX market makers"). FXCM also offers its non-U.S. customers the ability to trade contracts-for-difference ("CFDs").

3.     FXCM's sole asset is an equity interest in FXCM Holdings, LLC.  Forex Capital Markets is the US subsidiary of FXCM Holdings, Inc.

4.     FXCM was founded in 2010 and is headquartered in New York, New York.  The Company's stock trades on the Nasdaq Global Market ("NASDAQ") under the ticker symbol "FXCM."

5.     Throughout the Class Period, FXCM and certain of its officers and directors misrepresented the Company's business, operational and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that between September 4, 2009 through at least 2014, FXCM's U.S. Subsidiary, Forex Capital Markets LLC ("FXCM LLC"), engaged in false and misleading solicitations of FXCM's retail foreign exchange customers by concealing its relationship with its most important market maker and by misrepresenting that its "No Dealing Desk" platform had no conflicts of interest with its customers.

Defendants also made false and/or misleading statements and/or failed to disclose that FXCM LLC made false statements to the National Futures Association ("NFA") about its relationship with the market maker.  Accordingly, FXCM misled investors regarding its adverse position to its retail customers and, as a result of the foregoing, FXCM's statements were materially false and/or misleading.

6.     On February 6, 2017, the U.S. Commodity Futures Trading Company ("CFTC") issued an order finding that FXCM LLC engaged in false and misleading solicitations of FXCM LLC's retail foreign exchange customers.  The CTFC Order states, in relevant part:

> **Washington, DC** – The U.S. Commodity Futures Trading Commission (CFTC) today issued an Order filing and settling charges against **Forex Capital Markets, LLC** (FXCM) , its parent company, **FXCM Holdings, LLC** (FXCM Holdings), and two founding partners, **Dror ("Drew") Niv**, and **William Ahdout**, who were, respectively, Chief Executive Officer of FXCM and Managing Director of FXCM, (collectively, Respondents). FXCM's principal place of business is New York, New York; Niv resides in Connecticut; and Ahdout resides in New York.

> The CFTC Order finds that, between September 4, 2009 though at least 2014 (the Relevant Period), FXCM engaged in false and misleading solicitations of FXCM's retail foreign exchange (forex) customers by concealing its relationship with its most important market maker and by misrepresenting that its "No Dealing Desk" platform had no conflicts of interest with its customers. The Order finds FXCM, FXCM Holdings, and Niv responsible for FXCM making false statements to the National Futures Association (NFA) about its relationship with the market maker.

> The Order requires Respondents jointly and severally to pay a $7 million civil monetary penalty and to cease and desist from further violations of the Commodity Exchange Act and CFTC Regulations, as charged. FXCM, Niv, and Ahdout agree to withdraw from CFTC registration; never to seek to register with the CFTC; and never to act in any capacity requiring registration or exemption from registration, or act as a principal, agent, officer, or employee of any person that is registered, required to be registered, or exempted from registration with the CFTC.

**"The CFTC Is Committed to Protecting Customers from Harm in the Markets It Regulates"**

"Full and truthful disclosure to customers and honest discourse with self-regulatory organizations such as NFA are vital to the integrity and oversight of our markets," said Gretchen L. Lowe, Principal Deputy Director and Chief Counsel of the CFTC's Division of Enforcement. "Today's action's demonstrates that the CFTC is committed to protecting customers from harm in the markets it regulates."

FXCM is registered with the CFTC as a Futures Commission Merchant and Retail Foreign Exchange Dealer. FXCM has been providing retail customers with access to over-the-counter forex markets through a proprietary technology platform and has acted as counterparty in transactions with its retail customers in which customers can buy one currency and simultaneously sell another. Both Niv and Ahdout were CFTC registrants during the relevant period.

FXCM, under Niv's and Ahdout's direction and control, misrepresented to its retail forex customers that when they traded forex on FXCM's No Dealing Desk platform, FXCM would have no conflict of interest, the Order finds. In addition, according to FXCM's marketing campaign, retail customers' profits or losses would have no impact on FXCM's bottom line, because FXCM's role in the customers' trades was merely that of a credit intermediary, the Order finds. FXCM further represented that the risk would be borne by banks and other independent "market makers" that provided liquidity to the platform, according to the Order.

**FXCM's Undisclosed Interest**

Contrary to these representations, the Order finds, FXCM had an undisclosed interest in the market maker that consistently "won" the largest share of FXCM's trading volume – and thus was taking positions opposite FXCM's retail customers. FXCM, the Order finds, formulated a plan in 2009 to create an algorithmic trading system, using an FXCM computer program that could make markets to FXCM's customers, and thereby either replace or compete with the independent market makers on FXCM's "No Dealing Desk" platform. Although FXCM eventually spun off the algorithmic trading system as a new company, in actuality the company remained closely aligned with FXCM, according to the Order. This market maker received special trading privileges, benefitted from a no-interest loan provided by FXCM, worked out of FXCM's offices, and

used FXCM employees to conduct its business, the Order further finds.

The Order finds that FXCM and the market maker agreed that the market maker would rebate to FXCM approximately 70 percent of its revenue from trading on FXCM's retail forex platform. In total, through monthly payments from 2010 through 2014, the company rebated to FXCM approximately $77 million of the revenue it achieved. However, FXCM did not disclose to customers, among other things, that this company – FXCM's principal market maker – was a startup firm spun off from FXCM, the Order further finds.

**False Statements to the NFA**

The Order also finds that FXCM willfully made false statements to NFA in order to conceal FXCM's role in the creation of its principal market maker as well as the fact that the market maker's owner had been an FXCM employee and managing director. The Order finds that during a meeting between NFA compliance staff and FXCM executives, Niv omitted to mention to NFA the details of FXCM's relationship with the market maker.

The Order holds Niv and Ahdout liable for FXCM's fraud violations as "controlling persons" who were responsible, directly or indirectly, for FXCM's violations. Niv is also held liable for FXCM's false statements to NFA as a controlling person who was responsible directly or indirectly for those violations. FXCM Holdings is held liable for FXCM's fraud and false statement violations as principal of FXCM, the Order also finds.

7.      On February 6, 2017, the Company also announced in a press release that it entered into a settlement with the NFA and CFTC against FXCM LLC for $7 million and that FXCM will be withdrawing from business in the United States.  The press release was filed with the SEC on February 7, 2016.

8.      On this news, FXCM's stock price fell from a closing price of $6.85 on February 6, 2017 to $3.45 on February 7, 2017, ***a drop of approximately 50%.***

9.      As a result of FXCM's wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and the Class purchased FXCM securities at artificially inflated prices and thereby suffered significant losses and damages

## JURISDICTION AND VENUE

10.      The federal law claims asserted herein arise under §§ 10(b) and 20(a) of the Exchange Act, 15 U.S.C. § 78j(b) and § 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, as well as under the common law.

11.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and § 27 of the Exchange Act, 15 U.S.C. §78aa.

12.      This Court has jurisdiction over each Defendant named herein because each Defendant is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

13.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and § 27 of the Exchange Act because many of the false and misleading statements were made in or issued from this District.  FXCM is headquartered in this District, with its principal place of business located at 55 Water Street, FL 50, New York, NY 10041.

## CONTROLLING PERSON ALLEGATIONS

14.      By reason of the Individual Defendants' positions with the Company as executive officers, the Individual Defendants possessed the power and authority to control the contents of FXCM's quarterly reports, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, i.e., the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading

prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company, and their access to material, non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements pleaded herein.

## PARTIES

15.    Plaintiff purchased FXCM securities within the Class Period and, as a result, was damaged thereby.  Plaintiff's certification evidencing his transactions is attached hereto.

16.    Defendant FXCM is incorporated in Delaware with its executive offices located at 55 Water Street, FL 50, New York, NY 10041.  FXCM's common stock trades on the NASDAQ under the ticker symbol "FXCM."

17.    Defendant Dror Niv ("Niv") has served at all relevant times as FXCM's Chief Executive Officer and Chairman.

18.    Defendant Robert N. Lande ("Lande") has served at all relevant times as FXCM's Chief Financial Officer.

19.    Defendants Nive and Lande are collectively referred to herein as the "Individual Defendants" and, together with FXCM, the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### A.  Background

20.    FXCM is an online provider of FX trading and related services to over 175,000 active retail accounts globally. FXCM offers customers access to OIC FX markets and has developed a proprietary technology platform that provides customers with an efficient and cost-

effective way to trade FX. In an FX trade, a participant buys one currency and simultaneously sells

another, a combination known as a "currency pair." FXCM's platform seeks to present FX

customers with the best price quotations on 45 currency pairs from up to 31 global banks, financial

institutions and market makers ("FX market makers"). FXCM also offers its non-U.S. customers

the ability to trade CFDs.

21.     FXCM's sole asset is an equity interest in FXCM LLC.  Forex Capital Markets is

the US subsidiary of FXCM Holdings, Inc.

**B. Material Misstatements and Omissions during the Class Period**

22.     On March 15, 2012, FXCM filed an annual report on Form 10-K with the SEC,

announcing the Company's financial and operating results for the quarter and fiscal year ended

December 31, 2011 (the "2011 10-K").  The 2011 10-K stated, in relevant part:

> ***Our agency model is fundamental to our core business philosophy
> because we believe that it aligns our interests with those of our
> customers,*** reduces our risks and provides distinct advantages over
> the principal model used by the majority of retail FX brokers. In the
> principal model, the retail FX broker sets the price it presents to the
> customer and may maintain its trading position if it believes the
> price may move in its favor and against the customer. We believe
> this creates an inherent conflict between the interests of the customer
> and those of the principal model broker. Principal model brokers'
> revenues typically consist primarily of trading gains or losses and
> are more affected by market volatility than those of brokers utilizing
> the agency model.

(Emphasis added).

23.     The 2011 10-K also reported first quarter net income of $3.23 million, or $2.10 per

diluted share, on revenue of $108.69 million, compared to net income of $150,000, or $0.10 per

diluted share, on revenue of $96.09 million for the same period the prior year.  FXCM reported

fiscal year 2011 financial results, including net income of $12.74 million or $7.70 per diluted share,

on revenue of $415.58 million, compared to net income of $150,000, or $0.10 per diluted share, on revenue of $360.16 million for fiscal year 2010.

24.     The 2011 Form 10-K contained certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by the Individual Defendants, stating that the financial information contained therein was accurate and disclosed any material changes to the Company's internal control over financial reporting.

25.     On May 10, 2012, FXCM filed a quarterly report on Form 10-Q with the SEC ("May 2012 10-Q"), announcing the Company's financial and operating results for the quarter ended March 31, 2012.  FXCM reported net income of $2.89 million, or $1.60 per diluted share, on revenue of $102.32 million, compared to net income of $2.80 million, or $1.60 per diluted share, on revenue of $94.58 million for the same period the prior year.

26.     The May 2012 10-Q contained certifications pursuant to SOX by the Individual Defendants, which stated that the financial information contained in the May 2012 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

27.     On August 9, 2012, FXCM filed a quarterly report on Form 10-Q with the SEC ("August 2012 10-Q"), announcing the Company's financial and operating results for the quarter ended June 30, 2012.  FXCM reported a net loss of $1.44 million, or $0.60 per diluted share, on revenue of $91.41 million, compared to net income of $3.32 million, or $1.90 per diluted share, on revenue of $103.34 million for the same period the prior year.

28.     The August 2012 10-Q contained certifications pursuant to SOX by the Individual Defendants, which stated that the financial information contained in the August 2012 10-Q was

accurate and disclosed any material changes to the Company's internal control over financial reporting.

29.     On November 9, 2012, FXCM filed a quarterly report on Form 10-Q with the SEC ("November 2012 10-Q"), announcing the Company's financial and operating results for the quarter ended September 30, 2012.  FXCM reported net income of $4.51 million, or $1.70 per diluted share, on revenue of $113.79 million, compared to net income of $3.4 million, or $2.10 per diluted share, on revenue of $108.98 million for the same period the prior year.

30.     The November 2012 10-Q contained certifications pursuant to SOX by the Individual Defendants, which stated that the financial information contained in the November 2012 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

31.     On March 18, 2013, FXCM filed an annual report on Form 10-K with the SEC ("2012 10-K"), announcing the Company's financial and operating results for the quarter and fiscal year ended December 31, 2012.  The 2012 10-K stated, in relevant part:

> ***We primarily offer our customers what is referred to as an agency model to execute their trades. Our agency model is fundamental to our core business philosophy because we believe that it aligns our interests with those of our customers and reduces our risks.*** In the agency model, when our customer executes a trade on the best price quotation offered by our FX market makers, we act as a credit intermediary, or riskless principal, simultaneously entering into offsetting trades with both the customer and the FX market maker. We earn trading fees and commissions by adding a markup to the price provided by the FX market makers and generate our trading revenues based on the volume of transactions and the spread earned on transactions.

(Emphasis added).

32.     For the quarter, the 2012 10-K reported net income of $3 million, or $1.10 per diluted share, on revenue of $107.03 million, compared to net income of $3.23 million, or $2.10

per diluted share, on revenue of $108.69 million for the same period the prior year. With respect to fiscal year 2012, the Company reported net income of $8.96 million, or $3.70 per diluted share, on revenue of $414.55 million, compared to net income of $12.74 million or $7.70 per diluted share on revenue of $415.58 million for fiscal year 2011.

33.    The 2012 10-K contained certifications pursuant to SOX by the Individual Defendants, which stated that the financial information contained in the May 2012 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

34.    On May 10, 2013, FXCM filed a quarterly report on Form 10-Q with the SEC ("May 2013 10-Q"), announcing the Company's financial and operating results for the quarter ended March 31, 2013.  FXCM reported net income of $6.86 million, or $2.30 per diluted share, on revenue of $122.05 million, compared to net income of $2.89 million, or $1.60 per diluted share, on revenue of $102.32 million for the same period the prior year.

35.    The May 2013 10-Q contained certifications pursuant to SOX by the Individual Defendants, which stated that the financial information contained in the May 2013 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

36.    On August 8, 2013, FXCM filed a quarterly report on Form 10-Q with the SEC ("August 2013 10-Q"), announcing the Company's financial and operating results for the quarter ended June 30, 2013.  FXCM reported net income of $10.12 million, or $3.20 per diluted share, on revenue of $138.84 million, compared to net income of $1.44 million, or $0.60 per diluted share, on revenue of $91.41 million for the same period the prior year.

37.     The August 2013 10-Q contained certifications pursuant to SOX by the Individual Defendants, which stated that the financial information contained in the August 2013 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

38.     On November 12, 2013, FXCM filed a quarterly report on Form 10-Q with the SEC ("November 2013 10-Q"), announcing the Company's financial and operating results for the quarter ended September 30, 2013.  FXCM reported net income of $5.12 million, or $1.50 per diluted share, on revenue of $113.25 million, compared to net income of $4.51 million, or $1.70 per diluted share, on revenue of $113.79 million for the same period the prior year.

39.     The November 2013 10-Q contained certifications pursuant to SOX by the Individual Defendants, which stated that the financial information contained in the November 2013 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

40.     On March 17, 2014, FXCM filed an annual report on Form 10-K with the SEC ("2013 10-K"), announcing the Company's financial and operating results for the quarter and fiscal year ended December 31, 2013.  The 2013 10-K stated, in relevant part:

> ***We primarily offer our customers what is referred to as an agency model to execute their trades. Our agency model is fundamental to our core business philosophy because we believe that it aligns our interests with those of our customers and reduces our risks.*** In the agency model, when our customer executes a trade on the best price quotation offered by our FX market makers, we act as a credit intermediary, or riskless principal, simultaneously entering into offsetting trades with both the customer and the FX market maker. We earn trading fees and commissions by adding a markup to the price provided by the FX market makers.

(Emphasis added).

12

41.     For the quarter, FXCM reported net income of $2.97 million, or $0.80 per diluted share, on revenue of $110.65 million, compared to net income of $3.0 million, or $1.10 per diluted share, on revenue of $107.03 million for the same period the prior year.  For fiscal year 2013, FXCM reported net income of $14.83 million or $4.40 per diluted share, on revenue of $481.92 million, compared to net income of $8.96 million or $3.70 per diluted share, on revenue of $414.55 million for fiscal year 2012.

42.     The 2013 10-K contained certifications pursuant to SOX by the Individual Defendants, which stated that the financial information contained in the 2013 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

43.     On May 12, 2014, FXCM filed a quarterly report on Form 10-Q with the SEC ("May 2014 10-Q"), announcing the Company's financial and operating results for the quarter ended March 31, 2014.  FXCM reported net income of $2.08 million, or $0.53 per diluted share, on revenue of $82.83 million, compared to net income of $6.86 million, or $2.30 per diluted share, on revenue of $122.05 million for the same period the prior year.

44.     The May 2014 10-Q contained certifications pursuant to SOX by the Individual Defendants, which stated that the financial information contained in the May 2014 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

45.     On August 8, 2014, FXCM filed a quarterly report on Form 10-Q with the SEC ("August 2014 10-Q"), announcing the Company's financial and operating results for the quarter ended June 20, 2014.  FXCM reported a net loss of $3.08 million, or $0.80 per diluted share, on revenue of $79.99 million, compared to net income of $10.12 million, or $3.20 per diluted share, on revenue of $138.84 million for the same period the prior year.

46.     The August 2014 10-Q contained certifications pursuant to SOX by the Individual Defendants, which stated that the financial information contained in the August 2014 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

47.     On November 7, 2014, FXCM filed a quarterly report on Form 10-Q with the SEC ("November 2014 10-Q"), announcing the Company's financial and operating results for the quarter ended September 30, 2014.  FXCM reported net income of $2.39 million, or $0.55 per diluted share, on revenue of $88.36 million, compared to net income of $5.12 million, or $1.50 per diluted share, on revenue of $113.25 million for the same period the prior year.

48.     The November 2014 10-Q contained certifications pursuant to SOX by the Individual Defendants, which stated that the financial information contained in the November 2014 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

49.     On March 16, 2015, FXCM filed an annual report on Form 10-K with the SEC ("2014 10-K"), announcing the Company's financial and operating results for the quarter and fiscal year ended December 31, 2014.  The 2014 10-K stated, in relevant part:

> ***We primarily offer our customers what is referred to as an agency model to execute their trades. Our agency model is fundamental to our core business philosophy because we believe that it aligns our interests with those of our customers and reduces our risks.*** In the agency model, when our customer executes a trade on the best price quotation offered by our FX market makers, we act as a credit intermediary, or riskless principal, simultaneously entering into offsetting trades with both the customer and the FX market maker. This agency model has the effect of automatically hedging our positions and eliminating market risk exposure. Generally, we earn trading fees through commissions or by adding a markup to the price provided by the FX market makers. In certain geographic locations, we provide our customers with the price provided by the FX market makers and display trading fees and commissions separately.

(Emphasis added).

50.      For the quarter, FXCM reported net income of $15.76 million, or $3.46 per diluted share, on revenue of $101.75 million, compared to net income of $2.97 million, or $0.80 per diluted share, on revenue of $110.65 million for the same period the prior year.  For fiscal year 2014, FXCM reported net income of $17.15 million or $3.90 per diluted share, on revenue of $351.05 million, compared to net income of $14.83 million or $4.40 per diluted share, on revenue of $481.92 million for fiscal year 2013.

51.      The 2014 10-K contained certifications pursuant to SOX by the Individual Defendants, which stated that the financial information contained in the 2014 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

52.      On May 11, 2015, FXCM filed a quarterly report on Form 10-Q with the SEC ("May 2015 10-Q"), announcing the Company's financial and operating results for the quarter ended March 31, 2015.  FXCM reported net income of $426.82 million, or $90.56 per diluted share, on revenue of $215.19 million, compared to net income of $2.08 million, or $0.53 per diluted share, on revenue of $82.83 million for the same period the prior year.

53.      The May 2015 10-Q contained certifications pursuant to SOX by the Individual Defendants, which stated that the financial information contained in the May 2015 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

54.      On August 7, 2015, FXCM filed a quarterly report on Form 10-Q with the SEC ("August 2015 10-Q"), announcing the Company's financial and operating results for the quarter ended June 30, 2015.  FXCM reported net income of $95.81 million, or $19.70 per diluted share,

on revenue of $16.22 million, compared to net loss of $3.08 million, or $0.80 per diluted share, on revenue of $71.99 million for the same period the prior year.

55.     The August 2015 10-Q contained certifications pursuant to SOX by the Individual Defendants, which stated that the financial information contained in the August 2015 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

56.     On November 6, 2015, FXCM filed a quarterly report on Form 10-Q with the SEC ("November 2015 10-Q"), announcing the Company's financial and operating results for the quarter ended September 30, 2015.  FXCM reported net income of $73.65 million, or $13.86 per diluted share, on revenue of $30.61 million, compared to net income of $2.39 million, or $0.55 per diluted share, on revenue of $88.36 million for the same period the prior year.

57.     The November 2015 10-Q contained certifications pursuant to SOX by the Individual Defendants, which stated that the financial information contained in the November 2015 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

58.     On March 11, 2016, FXCM filed an annual report on Form 10-K with the SEC ("2015 10-K"), announcing the Company's financial and operating results for the quarter and year ended December 31, 2015.  The 2015 10-K stated, in relevant part:

> **We primarily offer our customers what is referred to as an agency model to execute their trades. Our agency model is fundamental to our core business philosophy because we believe that it aligns our interests with those of our customers and reduces our risks**. In the agency model, when our customer executes a trade on the best price quotation offered by our FX market makers, we act as a credit intermediary, or riskless principal, simultaneously entering into offsetting trades with both the customer and the FX market maker. This agency model has the effect of automatically hedging our positions and eliminating market risk exposure. Beginning in 2015,

we began to offer a dealing desk, or principal, execution model to smaller retail clients. Under the dealing desk model, we maintain our trading position and do not offset the trade with another party on a one for one basis. CFDs are primarily a dealing desk offering. By combining smaller positions and trading them out on an aggregate basis, we are able to optimize revenues from accounts that are less actively traded. Generally, under both models, we earn trading fees through commissions or by adding a markup to the price provided by the FX market makers. In certain geographic locations, we provide our customers with the price provided by the FX market makers and display trading fees and commissions separately. Revenues earned under the dealing desk model also include our realized and unrealized foreign currency trading gains or losses on our positions with customers.

(Emphasis added).

59.     For the quarter, FXCM reported net loss of $104.95 million, or $19.29 per diluted share, on revenue of $67.35 million, compared to net income of $15.76 million, or $3.46 per diluted share, on revenue of $101.75 million for the same period the prior year.  For fiscal year 2015, FXCM reported a net loss of $553.93 million or $108.89 per diluted share, on revenue of $402.28 million, compared to net income of $17.15 million or $3.90 per diluted share, on revenue of $351.05 million for fiscal year 2014.

60.     The 2015 10-K contained certifications pursuant to SOX by the Individual Defendants, which stated that the financial information contained in the 2015 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

61.     On May 6, 2016, FXCM filed a quarterly report on Form 10-Q with the SEC ("May 2016 10-Q"), announcing the Company's financial and operating results for the quarter ended March 31, 2016.  FXCM reported net income of $49.74 million, or $8.88 per diluted share, on revenue of $71.52 million, compared to net loss of $426.82 million, or $90.56 per diluted share, on revenue of $215.19 million for the same period the prior year.

62.     The May 2016 10-Q contained certifications pursuant to SOX by the Individual Defendants, which stated that the financial information contained in the May 2016 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

63.     On August 5, 2016, FXCM filed a quarterly report on Form 10-Q with the SEC ("August 2016 10-Q"), announcing the Company's financial and operating results for the quarter ended June 30, 2016.  FXCM reported net income of $60.40 million, or $10.78 per diluted share, on revenue of $70.56 million, compared to net loss of $95.81 million, or $19.70 per diluted share, on revenue of $16.22 million for the same period the prior year.

64.     The August 2016 10-Q contained certifications pursuant to SOX by the Individual Defendants, which stated that the financial information contained in the August 2016 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

65.     On November 12, 2016, FXCM filed a quarterly report on Form 10-Q with the SEC ("November 2016 10-Q"), announcing the Company's financial and operating results for the quarter ended September 30, 2016.  FXCM reported a net loss of $39.13 million, or $6.98 per diluted share, on revenue of $41.92 million, compared to net income of $73.65 million, or $13.86 per diluted share, on revenue of $30.61 million for the same period the prior year.

66.     The November 2016 10-Q contained certifications pursuant to SOX by the Individual Defendants, which stated that the financial information contained in the November 2016 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

67.     The statements in paragraphs 22-66 above were false and misleading because Defendants failed to disclose that: (i) between September 4, 2009 through at least 2014, FXCM's U.S. Subsidiary, FXCM LLC, engaged in false and misleading solicitations of FXCM's retail foreign exchange customers by concealing its relationship with its most important market maker and by misrepresenting that its "No Dealing Desk" platform had no conflicts of interest with its customers; (ii) FXCM LLC made false statements to the NFA about its relationship with the market maker; and (iii) FXCM therefore misled investors regarding its adverse position to its retail customers; and (iv) as a result of the foregoing, FXCM's statements were material false and/or misleading.

**C.  The Truth Emerges**

68.     On February 6, 2017, the CFTC issued an order finding that FXCM LLC engaged in false and misleading solicitations of FXCM LLC's retail foreign exchange customers.  The CTFC Order sates, relevant part:

> **Washington, DC** – The U.S. Commodity Futures Trading Commission (CFTC) today issued an Order filing and settling charges against **Forex Capital Markets, LLC** (FXCM) , its parent company, **FXCM Holdings, LLC** (FXCM Holdings), and two founding partners, **Dror ("Drew") Niv**, and **William Ahdout**, who were, respectively, Chief Executive Officer of FXCM and Managing Director of FXCM, (collectively, Respondents). FXCM's principal place of business is New York, New York; Niv resides in Connecticut; and Ahdout resides in New York.
>
> ***The CFTC Order finds that, between September 4, 2009 though at least 2014 (the Relevant Period), FXCM engaged in false and misleading solicitations of FXCM's retail foreign exchange (forex) customers by concealing its relationship with its most important market maker and by misrepresenting that its "No Dealing Desk" platform had no conflicts of interest with its customers. The Order finds FXCM, FXCM Holdings, and Niv responsible for FXCM making false statements to the National Futures Association (NFA) about its relationship with the market maker.***

*The Order requires Respondents jointly and severally to pay a $7 million civil monetary penalty and to cease and desist from further violations of the Commodity Exchange Act and CFTC Regulations, as charged. FXCM, Niv, and Ahdout agree to withdraw from CFTC registration; never to seek to register with the CFTC; and never to act in any capacity requiring registration or exemption from registration, or act as a principal, agent, officer, or employee of any person that is registered, required to be registered, or exempted from registration with the CFTC.*

**"The CFTC Is Committed to Protecting Customers from Harm in the Markets It Regulates"**

"Full and truthful disclosure to customers and honest discourse with self-regulatory organizations such as NFA are vital to the integrity and oversight of our markets," said Gretchen L. Lowe, Principal Deputy Director and Chief Counsel of the CFTC's Division of Enforcement. "Today's action's demonstrates that the CFTC is committed to protecting customers from harm in the markets it regulates."

FXCM is registered with the CFTC as a Futures Commission Merchant and Retail Foreign Exchange Dealer. FXCM has been providing retail customers with access to over-the-counter forex markets through a proprietary technology platform and has acted as counterparty in transactions with its retail customers in which customers can buy one currency and simultaneously sell another. Both Niv and Ahdout were CFTC registrants during the relevant period.

FXCM, under Niv's and Ahdout's direction and control, misrepresented to its retail forex customers that when they traded forex on FXCM's No Dealing Desk platform, FXCM would have no conflict of interest, the Order finds. In addition, according to FXCM's marketing campaign, retail customers' profits or losses would have no impact on FXCM's bottom line, because FXCM's role in the customers' trades was merely that of a credit intermediary, the Order finds. FXCM further represented that the risk would be borne by banks and other independent "market makers" that provided liquidity to the platform, according to the Order.

**FXCM's Undisclosed Interest**

*Contrary to these representations, the Order finds, FXCM had an undisclosed interest in the market maker that consistently "won" the largest share of FXCM's trading volume – and thus was taking*

*positions opposite FXCM's retail customers.* FXCM, the Order finds, formulated a plan in 2009 to create an algorithmic trading system, using an FXCM computer program that could make markets to FXCM's customers, and thereby either replace or compete with the independent market makers on FXCM's "No Dealing Desk" platform. Although FXCM eventually spun off the algorithmic trading system as a new company, in actuality the company remained closely aligned with FXCM, according to the Order. This market maker received special trading privileges, benefitted from a no-interest loan provided by FXCM, worked out of FXCM's offices, and used FXCM employees to conduct its business, the Order further finds.

The Order finds that FXCM and the market maker agreed that the market maker would rebate to FXCM approximately 70 percent of its revenue from trading on FXCM's retail forex platform. In total, through monthly payments from 2010 through 2014, the company rebated to FXCM approximately $77 million of the revenue it achieved. However, FXCM did not disclose to customers, among other things, that this company – FXCM's principal market maker – was a startup firm spun off from FXCM, the Order further finds.

**False Statements to the NFA**

*The Order also finds that FXCM willfully made false statements to NFA in order to conceal FXCM's role in the creation of its principal market maker as well as the fact that the market maker's owner had been an FXCM employee and managing director. The Order finds that during a meeting between NFA compliance staff and FXCM executives, Niv omitted to mention to NFA the details of FXCM's relationship with the market maker.*

The Order holds Niv and Ahdout liable for FXCM's fraud violations as "controlling persons" who were responsible, directly or indirectly, for FXCM's violations. Niv is also held liable for FXCM's false statements to NFA as a controlling person who was responsible directly or indirectly for those violations. FXCM Holdings is held liable for FXCM's fraud and false statement violations as principal of FXCM, the Order also finds.

(Emphasis added).

69.   On February 6, 2017, the Company also announced in a press release that it entered into a settlement with the NFA and CFTC against FXCM LLC for $7 million and that FXCM will

21

be withdrawing from business in the United States.  The press release was filed with the SEC on

February 7, 2016 and states, in relevant part:

> NEW YORK, February 6, 2017-- FXCM Inc. (NASDAQ:FXCM) ("FXCM") today announced simultaneous regulatory settlements with the National Futures Association ("NFA") and the Commodity Futures Trading Commission ("CFTC") against its U.S. subsidiary, Forex Capital Markets LLC and certain of its principals. FXCM Holdings, LLC was also named in the CFTC settlement. The named FXCM entities and principals neither admit nor deny the allegations associated with the settlements. The NFA settlement has no monetary fine, and the CFTC settlement has a $7 million fine.
>
> FXCM will be withdrawing from business in the U.S. and has signed a non-binding letter of intent with GAIN Capital Holdings, Inc. ("GAIN") under which GAIN would purchase FXCM's U.S. customer accounts.  The transaction is subject to regulatory approval and a definitive agreement.  FXCM and GAIN are working to determine the timing for the account transfer and expect to provide further information in that regard in the coming days.  In 2016, FXCM's U.S. business had unaudited net revenues of approximately $48 million and generated an EBITDA1 loss, but the costs associated with the business will not be transferring to GAIN.  There will be no changes to FXCM customers outside of the United States.
>
> Withdrawing from this business will free approximately $52 million in capital.  Proceeds from the account sale and the release of capital will go toward the further repaying of FXCM's loan from Leucadia National Corporation.
>
> FXCM will for the interim period continue to service its U.S. customers and to provide top quality trade execution pending the customer-account sale and business withdrawal.  FXCM will also be working diligently to be sure that an account transition to GAIN's retail brand, FOREX.com, will be orderly, expeditious and seamless.  FXCM wants to express its most sincere thanks to those U.S. customers who have been with FXCM over the years and wish you all the best of luck following this transition.
>
> FXCM wants to stress that these settlements have no impact on any customer of FXCM's global businesses.  FXCM and its global subsidiaries will continue to provide excellent execution and competitive pricing to its customers overseas through its award-winning technology, customer service and trading tools.

70.     On this news, FXCM's stock price fell from a closing price of $6.85 on February 6, 2017 to $3.45 on February 7, 2017, *a drop of approximately 50%.*

71.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in market value of the Company's securities, Plaintiff and other class members have suffered significant losses and damages.

## ADDITIONAL SCIENTER ALLEGATIONS

72.      As alleged herein, Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding FXCM, their control over, and/or receipt and/or modification of FXCM's allegedly materially misleading statements and/or their associations with the Company which made them privy to confidential proprietary information concerning FXCM, participated in the fraudulent scheme alleged herein.

## LOSS CAUSATION AND ECONOMIC LOSS

73.     During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the Company's stock price, and operated as a fraud or deceit on acquirers of the Company's securities. As detailed above, when the truth about FXCM's misconduct was revealed, the value of the Company's securities declined precipitously as the prior artificial inflation no longer propped up its stock price. The decline in FXCM's share price was a direct result of the nature and extent of Defendants' fraud finally being

revealed to investors and the market. The timing and magnitude of the common stock price decline negates any inference that the loss suffered by Plaintiff and other members of the Class was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the Defendants' fraudulent conduct. The economic loss, i.e., damages, suffered by Plaintiff and other Class members, was a direct result of Defendants' fraudulent scheme to artificially inflate the Company's stock price and the subsequent significant decline in the value of the Company's share, price when Defendants' prior misrepresentations and other fraudulent conduct was revealed.

74. At all relevant times, Defendants' materially false and misleading statements or omissions alleged herein directly or proximately caused the damages suffered by the Plaintiff and other Class members.  Those statements were materially false and misleading through their failure to disclose a true and accurate picture of FXCM's business, operations and financial condition, as alleged herein.  Throughout the Class Period, Defendants publicly issued materially false and misleading statements and omitted material facts necessary to make Defendants' statements not false or misleading, causing FXCM's securities to be artificially inflated.  Plaintiff and other Class members purchased FXCM's securities at those artificially inflated prices, causing them to suffer the damages complained of herein.

## PRESUMPTION OF RELIANCE; FRAUD-ON-THE-MARKET

75. At all relevant times, the market for FXCM securities was an efficient market for the following reasons, among others:

> (a) FXCM securities met the requirements for listing, and were listed and actively traded on the NASDAQ, a highly efficient market;

> (b) During the Class Period, FXCM securities were actively traded, demonstrating a

strong presumption of an efficient market;

(c) As a regulated issuer, FXCM filed with the SEC periodic public reports during the Class Period;

(d) FXCM regularly communicated with public investors via established market communication mechanisms;

(e) FXCM was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

(f) Unexpected material news about FXCM was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

76.    As a result of the foregoing, the market for FXCM securities promptly digested current information regarding FXCM from all publicly available sources and reflected such information in FXCM's stock price.  Under these circumstances, all purchasers of FXCM securities during the Class Period suffered similar injury through their purchase of FXCM's securities at artificially inflated prices, and a presumption of reliance applies.

77.    Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures.  Positive proof of reliance is not a prerequisite to recovery pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972).   All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.  Here, the facts withheld are material because an investor would have considered the Company's net losses and adequacy of internal controls over financial reporting when

deciding whether to purchase and/or sell stock in FXCM.

**NO SAFE HARBOR; INAPPLICABILITY OF BESPEAKS CAUTION DOCTRINE**

78.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint.

79.     To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

80.     Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of FXCM who knew that the "forward-looking statement" was false.  Alternatively, none of the historic or present-tense statements made by the defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

**CLASS ACTION ALLEGATIONS**

81.     Plaintiff brings this action on behalf of all individuals and entities who purchased or otherwise acquired FXCM securities on the public market during the Class Period, and were damaged, excluding the Company, the defendants and each of their immediate family members, legal representatives, heirs, successors or assigns, and any entity in which any of the defendants have or had a controlling interest (the "Class").

82.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, FXCM securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by FXCM or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.  As of November 7, 2016, FXCM had over 5.6 million outstanding shares of common stock.  Upon information and belief, these shares are held by thousands if not millions of individuals located geographically throughout the country and possibly the world.  Joinder would be highly impracticable.

83.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by the defendants' respective wrongful conduct in violation of the federal laws complained of herein.

84.     Plaintiff has and will continue to fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

85.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

        a.   whether the federal securities laws were violated by the defendants' respective acts as alleged herein;

b.  whether the defendants acted knowingly or with deliberate recklessness in issuing false and misleading financial statements;

c.  whether the price of FXCM securities during the Class Period was artificially inflated because of the defendants' conduct complained of herein; and

d.  whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

86.  A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I

**(Violation of Section 10(b) and Rule 10b-5 Against All Defendants)**

87.  Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

88.  During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (1) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (2) cause Plaintiff and other members of the Class to purchase FXCM securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, each of the Defendants took the actions set forth herein.

89.     Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for FXCM securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.   All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

90.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of FXCM as specified herein.

91.     These Defendants employed devices, schemes, and artifices to defraud while in possession of material adverse non-public information, and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of FXCM's value and performance and continued substantial growth, which included the making of, or participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about FXCM and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business that operated as a fraud and deceit upon the purchasers of FXCM securities during the Class Period.

92.     Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (1) Individual Defendants were high-level executives, directors, and/or

agents at the Company during the Class Period and members of the Company's management team or had control thereof; (2) each Individual Defendant, by virtue of the Individual Defendant's responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal affairs; (3) each Individual Defendant enjoyed significant personal contact and familiarity with the other Individual Defendant and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's internal affairs at all relevant times; and (4) each Individual Defendant was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

93.     Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing FXCM's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities.  As demonstrated by Defendants' misstatements of the Company's business affairs throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

94.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of FXCM's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of

FXCM's publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the common stock trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired FXCM's securities during the Class Period at artificially high prices and were or will be damaged thereby.

95.     At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding FXCM's financial results and its adverse position with its retail foreign exchange customers, which was not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their FXCM securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices that they paid.

96.     By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

97.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

98.     This action was filed within two years of discovery of the fraud and within five years of Plaintiff's purchases of securities giving rise to the cause of action.

## COUNT II

### (The Individual Defendants Violated Section 20(a) of the Exchange Act)

99.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

100.    The Individual Defendants acted as controlling persons of FXCM within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, agency, ownership and contractual rights, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading.  The Individual Defendants provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to have been misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

101.    In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

102.    As set forth above, the Individual Defendants each violated Section 10(b), and Rule 10b-5 promulgated thereunder, by their acts and omissions as alleged in this Complaint.

103.   By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Individual Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

104.   This action was filed within two years of discovery of the fraud and within five years of Plaintiff's purchases of securities giving rise to the cause of action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment as follows:

(a)   Determining that this action is a proper class action, certifying Plaintiff as class representative under Federal Rule of Civil Procedure 23 and Plaintiff's counsel as class counsel;

(b)   Awarding compensatory damages in favor of Plaintiff and the other members of the Class against all Defendants, jointly and severally, for all damages sustained as a result of the defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)   Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

(d)   Granting extraordinary equitable and/or injunctive relief as permitted by law; and

(e)   Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a jury trial.

Dated: February 10, 2017

/s/ *Shannon L. Hopkins*
**LEVI & KORSINSKY, LLP**
Shannon L. Hopkins
LEVI & KORSINSKY, LLP
733 Summer Street, Suite 304
Stamford, Connecticut 06901
Telephone:  (203) 992-4523
Facsimile:  (212) 363-7171

*Counsel for Plaintiff and Proposed Lead Counsel for the Class*